1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 01cv414 BTM (NLS) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S AND CLAIMANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| RICARDO PEREZ-LOPEZ, et al., | |
| Claimants, | |
| vs. | |
| $57,790.00 IN U.S. CURRENCY, | |
| Defendant. | |

Presently before the Court are cross motions for summary judgment filed by Plaintiff and Claimants in this civil forfeiture action brought under 21 U.S.C. § 881.  For the reasons discussed below, both Plaintiff's motion and Claimant's motion are **DENIED**.

**I.      FACTUAL BACKGROUND**

Claimant Ricardo Perez-Lopez, who along with his wife Edendina Peraza-Soto brings the current cross-motion, was stopped for a traffic violation by Chula Vista police officers on July 27, 2000.  Mr. Lopez was the driver of a vehicle which had just left a residence in Chula Vista that was the subject of an ongoing surveillance relating to marijuana trafficking.  Mr. Lopez consented to a search of his car and $57,790.00 in currency was discovered in the center console and behind the driver's seat.

Mr. Lopez then consented to a search of the surveilled residence and inspection by

a narcotics-sniffing dog revealed several places within the house where the dog "alerted," or indicated that he detected narcotics.  However, no drugs were actually found in the home, nor were either of the claimants ever charged with a crime in connection with this incident. The Government has alleged that, on three separate occasions in February 2000 (some 5 months before the incident in question), they searched claimants' garbage, disposed of either at the curb or in a landfill, and found cellophane wrapping often used for bundling marijuana with marijuana residue on it.  In addition, claimant Lopez was arrested at the San Ysidro POE in June 1992 for smuggling 69 pounds of marijuana into the US from Mexico.  He was also a passenger in a vehicle driven by his brother, which was found to contain 18 pounds of marijuana, in June 1998, though he was not arrested in connection with that incident.  He was not convicted of any crime relating to either incident or any other offense.

When questioned about the large sum of cash that he was carrying, Mr. Lopez first indicated he was bringing it to Tijuana, Mexico but then recanted and explained that he wasn't taking it to Mexico because he could not take more than $10,000 across the border. Mr. Lopez explained that he received the money from a Mr. Eddie Pimentel in partial payment for the sale of his house, which had just occurred.  His explanation for when he actually received the cash payments which comprised the approximately $58,000 was inconsistent with explanations given by his wife, though she claimed she was just recounting what her husband had told her regarding the sale of the house.  Title to the house was ultimately transferred from Ms. Soto to the Pimentels (in Mrs. Pimentels name) pursuant to a grant deed dated August 14, 2000 and recorded on August 17, 2000.

The Drug Enforcement Administration ("DEA") seized the $57,790 in currency found in Mr. Lopez's car as monies furnished or intended to be furnished in exchange for a controlled substance or, alternatively, as proceeds traceable to such an exchange.  21 U.S.C. § 881(a)(6).  On October 26, 2000, Mr. Lopez, through his counsel, filed a claim for the seized property, which was received by the DEA three days later.  In the claim, Mr. Lopez identified the specific property being claimed by referencing the $57,790 in U.S. currency seized on July 27, 2000 in Chula Vista and then made the following statement under penalty

01cv414

of perjury:

> Pursuant to Title 18, United States Code, Section 983, I, Ricardo Perez-Lopez, hereby make demand for the return and restitution of the seized U.S. currency, and claim the right to defend this action as an individual with an ownership interest in, and/or as an agent of persons or entities with an ownership interest in, and/or as a bailor/bailee of individuals or entities with an ownership interest in said U.S. currency. This claim is not frivolous.

Handwritten into the above-quoted text, which appeared in typeface, just above the words "bailee of individuals," Mr. Lopez had written the name Enedina Peraza Soto.

Mr. Lopez attached to the claim a copy of the August 14, 2000 grant deed by which his Chula Vista house was transferred from his wife, Ms. Soto, to Mrs. Pimentel, but he included no explanation for the relevance of this document to the claim. On November 27, 2000, the DEA sent a letter to Mr. Lopez's counsel which questioned the inclusion of the grant deed in the claim. The letter stated:

> The Grant Deed you submitted, presumably as customary documentary evidence of your client's interest in the property, reflects a transaction occurring after the seizure between parties other than the claimant. Please identify your client's particular interest in the property and explain the relationship between the submitted documentary evidence and that interest, submit additional customary documentary evidence of such interest, or explain why such evidence is unavailable.

On December 6, 2000, counsel for Mr. Lopez responded to the DEA and explained that Ms. Soto was Mr. Lopez's wife, and that the money seized represented proceeds from the sale of the house referenced in the grant deed. This letter was apparently received by the DEA on December 13, 2000.

On March 9, 2001, 131 days after receipt of Mr. Lopez's original claim form, and 86 days after the DEA received Mr. Lopez's counsel's response to its further inquiry, the U.S. Attorney filed the instant complaint for forfeiture of the seized funds.

//

//

//

//

3

01cv414

II.     **DISCUSSION**

     A.     **Timeliness of the Government's Complaint**

Civil asset forfeiture proceedings are governed by 18 U.S.C. § 983, which was enacted in 2000 as part of the Civil Asset Forfeiture Reform Act ("CAFRA").   The law mandates a 90-day deadline for filing of a forfeiture complaint from the time a claim is filed. The statute states that if the Government does not file a complaint for forfeiture within 90 days of a claim being filed, it "**shall** promptly release the property . . .."   18 U.S.C. § 983(a)(3)(emphasis added).

The crux of the parties' dispute centers on whether the claim originally filed by Mr. Lopez on October 26, 2000 satisfied the claim requirements provided for in CAFRA.   If that claim were valid, the Government's 90-day deadline for filing of a forfeiture complaint would have expired on January 27, 2001, approximately 41 days before the Government filed the instant complaint, and Claimants' motion for summary judgment should be granted. However, if the original claim did not meet the CAFRA requirements, then it was not a valid claim and, thus, the Government's 90-day period would not have begun until it received the clarifying letter from Claimant's counsel on December 13, 2000.   Under this calculation, the Government filed its forfeiture complaint within the required 90-day period and Claimants' motion for summary judgment upon this procedural ground should be denied.

     1.     Retroactive Amendment of the Relevant Statute

As first enacted on April 25, 2000, CAFRA required that a claim "shall (I) identify the specific property being claimed; (ii) state the claimant's interest in such property (and provide customary documentary evidence of such interest if available) and state that the claim is not frivolous; and (iii) be made under oath, subject to penalty of perjury."   18 U.S.C. § 983(a)(2)(C).   The statute took effect 120 days later and, thus, was operative when Claimant Lopez filed his original claim on October 26, 2000.   However, Congress enacted an amendment to the statute on December 21, 2000 eliminating the additional requirements of providing documentary evidence and stating that the claim is not frivolous.   In enacting this amendment, Congress provided that "[t]he amendment made by this section shall take effect

as if included in the amendment made by section 2(a) of Public Law 106-185," which was the original law enacting CAFRA. See Pub. L. No. 106-561, § 3. Accordingly, the amendment's effect was made retroactive to the effective date of CAFRA.

Claimants argue that the retroactive amendment of CAFRA requires that the adequacy of the original claim filed by Mr. Lopez on October 26, 2000 must be measured against the requirements of the amended statute, even though the statutory requirements were different at that time. They further argue that, if the claim filed on October 26, 2000 was valid under the amended statute, the retroactive effect of the amendment requires that the 90-day period for filing a forfeiture complaint began to run upon that date as well. By this calculation, the Government's complaint was untimely.

However, application of the rule contended for by Claimants would yield perverse and unjust results. CAFRA took effect on August 23, 2000 (120 days after enactment). If a claim were filed anytime within the first 30 days of the statute's effectiveness, the 90-day period for the Government to file its required forfeiture complaint would have run out prior to the December 21, 2000 amendment. Accordingly, it is possible that some claims filed during this period, which might have been properly rejected at the time, would retroactively become valid upon December 21, 2000, but the Government's time to bring a forfeiture complaint would have already expired. The Government would be required to release seized property, even though it properly rejected claims at the time they were filed, because it was now time-barred from filing a complaint. Such a result could not have been intended by Congress in enacting the CAFRA amendment.

Claimants point out that Congress provided no "savings clause" that would protect the Government from the seemingly unjust result of the choice to make the amendment retroactive. However, courts are empowered to provide for a reasonable "grace period" upon the enactment of a new law that has retroactive application in order to take proper account of the equitable considerations involved. In Duncan v. Walker, 533 U.S. 167 (2001), Justice Souter explained in concurrence that Courts of Appeal have uniformly created a 1-year grace period, running from the date of enactment of the Antiterrorism and Effective Death Penalty

01cv414

1   Act of 1996 ("AEDPA"), for prisoners filing habeas corpus petitions whose state convictions

2   became final prior to enactment of the AEDPA. 533 U.S. at 183-84. The AEDPA enacted

3   a 1-year period of limitation for all habeas corpus petitions which, in many cases, ran from

4   the date on which a petitioner's judgment became final. 28 U.S.C. § 2244(d)(1). For

5   prisoners whose convictions were finalized more than one year prior to the enactment of

6   AEDPA, any petition for habeas relief would suddenly be time-barred. As the Ninth Circuit

7   held in approving the 1-year grace period:

8         [A]pplying [AEDPA]'s limitation period in this fashion would
             impermissibly "attach[]new legal consequences to events completed
9         before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244,
             270, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). Those state
10        prisoners whose year had elapsed prior to AEDPA's enactment would
             be altogether barred from filing petitions that would have been timely
11        under the old regime. Those prisoners who had some days remaining
             before their year elapsed would face dire consequences for having
12        wasted the time prior to AEDPA's enactment: They would have to
             investigate, prepare and file a petition in however much time remained
13        - perhaps as little as one day.

14         We therefore conclude - along with the Second and Seventh Circuits -
             that AEDPA's one-year time limit did not begin to run against any state
15        prisoner prior to the statute's date of enactment.

16   <u>Calderon v. United States District Court</u>, 128 F.3d 1283, 1286-87 (9th Cir. 1997), *overruled*

17   *in part on other grounds*, 163 F.3d 530, 539-40 (9th Cir. 1998) (en banc).

18        Grace periods have also been employed by courts in dealing with changes to

19   governing statutes of limitations when such changes are the result of new court decisions,

20   rather than new statutes. In holding that a six-month grace period applied to actions under

21   the Railway Labor Act because a prior decision of the court had imposed a drastic reduction

22   in the governing statute of limitations, from two years to six months, the Ninth Circuit

23   explained: "It would be both unfair and illogical to expect these appellants to have foreseen

24   [the prior decision]." <u>Kelly v. Burlington Northern Railroad Company</u>, 896 F.2d 1194, 1198

25   (9th Cir. 1990). It would similarly be unfair and illogical to expect the DEA in this case to have

26   anticipated, when first examining Mr. Lopez's claim in October 2000, that the claim

27   requirements under CAFRA would be amended in December 2000 such that the claim would

28   become valid and, therefore, require that the DEA have forwarded the claim on for the filing

of a forfeiture complaint despite its present invalidities.

The equitable considerations that underlie a court's announcement of a grace period are the same as those which form the foundation of the longstanding presumption against retroactive application of legislation.  As the Supreme Court has explained: "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.  For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) (quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)).  The Fourth Circuit, in the AEDPA context, has described the compelling reasons for establishing a grace period accordingly:

> When application of a new limitation period would wholly eliminate claims for substantive rights or remedial actions considered timely under the old law, the application is "impermissibly retroactive."  The legislature cannot extinguish an existing cause of action by enacting a new limitation period without first providing a reasonable time after the effective date of the new limitation period in which to initiate the action. Indeed, the Supreme Court has stated that newly-enacted "statutes of limitations must allow a reasonable time after they take effect for the commencement of suits upon existing causes of action."
>
> As the Court explained almost a hundred years ago:
> It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. ***A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions***. It is essential that such statutes allow a reasonable time after they take effect for the commencement of suits upon existing causes of action . . ..

Brown v. Angelone, 150 F.3d 370, 373-74 (4th Cir. 1998) (citations omitted) (emphasis added).  Claimants' interpretation of the CAFRA amendment would bar the Government's right to proceed with the forfeiture of properly seized property without affording an opportunity to be heard and, therefore, would yield inequitable results that this Court cannot presume was Congress's intention.

1    In the AEDPA context and others, "[w]here a shortened limitations period would bar

2 previously-accrued claims, and where the legislature itself has not specified a grace period,

3 courts traditionally have provided that a 'reasonable time' shall be the shorter of: (1) the

4 original limitation period, commencing at the time the action accrued, or (2) the new,

5 shortened limitation period, commencing from the date the statute became effective."

6 Rogers v. United States, 180 F.3d 349, 354 (1st Cir. 1999); accord Kelly, 896 F.2d at 1199

7 (applying same rule to actions under Railway Labor Act, though substituting date of

8 governing court decision for date of statutory effectiveness); Usher v. City of Los Angeles,

9 828 F.2d 556, 561 (9th Cir. 1987) (same rule for § 1983 civil rights actions).  In deciding upon

10 an appropriate grace period relating to the CAFRA amendment, both prongs of the analysis

11 yield the same relevant date.  This is because the limitation period was always 90 days and,

12 under the first prong, that 90 day period starts when the action accrued, which this Court has

13 determined only occurred once the claim retroactively became valid on December 21, 2000

14 with the enactment of the CAFRA amendment.  This is obviously the same date that the

15 statute became effective.  Thus, the Court finds that a reasonable grace period within which

16 the Government must act upon previously filed claims, which only became valid with the

17 CAFRA amendment, is 90 days from the enactment of the amendment.  Accordingly, the

18 Government's March 9, 2001 forfeiture complaint was timely filed within 90 days of receipt

19 of Claimant's December 6, 2000 explanatory letter, which fulfilled the CAFRA requirements

20 as originally enacted, and was also timely filed within a 90-day grace period from the

21 December 21, 2000 enactment of the CAFRA amendment.

22    Claimants argue that the case of Bridges v. United States, 346 U.S. 209 (1953), is

23 analogous to the case at bar and supports dismissal of the Government's complaint.  During

24 World War II, Congress had enacted a special five-year statute of limitations for certain fraud

25 offenses perpetrated against the United States, suspending the usual three-year statute of

26 limitations then in effect.  Id.  In 1948, Congress repealed the special five-year statute of

27 limitations without providing another special limitations period, thereby reinstating the general

28 three-year statute of limitations.  Id. at 224-25.  The following year (1949), the Government

1   attempted to indict Bridges for acts that he allegedly had committed four years earlier in

2   1945.  Id. at 215.  The Supreme Court held that the indictment had to be dismissed as

3   untimely because when the indictment issued in 1949 only the three-year statute of

4   limitations period was in effect and the defendant's alleged bad acts had occurred four years

5   earlier.  Id. at 225-28.  Neither the three-year nor the five-year statute of limitations included

6   a clause stating the five-year limit would continue to apply to pre-1948 acts.  Thus, the 1948

7   repeal acted to immediately prevent the Government from proceeding against defendants

8   whom it could have properly sought indictments against just one day prior to the enactment

9   of the repeal statute.

10       Claimants seem to suggest that the Bridges holding authorizes the view that the

11   CAFRA amendment could alter the statute of limitations for the Government's filing of a

12   forfeiture complaint relating to conduct that occurred prior to the enactment of the

13   amendment.  However, there are two significant differences between the statute at issue in

14   Bridges and the CAFRA amendment at issue in the present action that make the Supreme

15   Court's holding inapplicable here.  First, Congress's intention to return to the three-year

16   statute of limitations was clear.  The Supreme Court held:

17

18       The purpose of Congress to substitute the general three-year
        limitation in place of the special five-year limitation is indicated in the
19       Reviser's Note . . . which says: 'In the consolidation of these sections
        the 5-year period of limitation for violations of the Nationality Code .
20       . . is reduced to 3 years.  There seemed no sound basis for
        considering 3 years adequate in the case of heinous felonies and
21       gross frauds against the United States but inadequate for misuse of
        a passport or false statement to a naturalization examiner.'

22   Bridges, 346 U.S. at 226.  There is no language within the CAFRA amendment, or any

23   explanatory note thereto, that makes reference to retroactively revising the statute of

24   limitations governing the Government's ability to file a forfeiture complaint for seized property.

25   Second, in Bridges, the application of the amended statute of limitations did not serve to

26   preclude the Government from ever seeking an indictment for crimes committed prior to its

27   enactment.  The Government had three years from the allegedly illegal acts to proceed with

28   criminal charges and the repeal only denied it the special opportunity of an extra two years.

9

1   However, as was explained above, the retroactive application of the CAFRA amendment
2   argued for by Claimants would serve to prevent the Government from *ever* having the
3   opportunity to forfeit property which it lawfully seized.  This is because the 90-day statute of
4   limitations for filing a forfeiture complaint only begins to run once a valid claim is received.
5   The limitations period for claims that were not valid under the pre-amendment CAFRA
6   requirements did not begin to run until the claims became valid upon the enactment of the
7   amendment.  Under Claimants' proposed interpretation, the statute of limitations would
8   immediately begin to run and, yet, have already run out upon the enactment of the CAFRA
9   amendment.  Thus, the Government would be denied *any* opportunity to proceed to forfeit
10  such property.  Such results are clearly not analogous and, thus, Bridges is not instructive
11  in this instance.

12      Claimants also argue that, whatever the inequity that would result to the Government,
13  Congress's intention to provide for retroactive applicability of the CAFRA amendment is
14  clearly expressed in its enacting language.  The Supreme Court has held that, "[a]bsent a
15  violation of [specific Constitutional] provisions, the potential unfairness of retroactive civil
16  legislation is not a sufficient reason for a court to fail to give a statute its intended scope."
17  Landgraf, 511 U.S. at 267.  However, the Court finds that the CAFRA amendment was not
18  intended to have the effect argued for by Claimants.  Rather, the amendment provided for
19  its retroactive application in order to protect claimants like Mr. Lopez who filed claims during
20  the period since CAFRA's enactment that were rejected for failing to provide customary
21  documentary evidence.  If the amendment had not provided that it would "take effect as if
22  included in the [original law enacting CAFRA]," claimants like Mr. Lopez would likely be time-
23  barred because 18 U.S.C. § 983(a)(2)(B) sets the deadline for filing claims at a minimum of
24  30 or 35 days from the notice of seizure.  That short window of time for filing a claim would
25  undoubtedly have closed for many claimants prior to the enactment of the amendment.
26  Accordingly, the CAFRA amendment retroactively applied to timely reinstate claims which
27  were otherwise valid but lacked customary documentary evidence or failed to state that the
28  claim was not frivolous.  This does not require that the Government's 90-day time period for

1    filing a forfeiture complaint was also retroactively backdated to the date of receipt of the

2    original, properly rejected, claim.

3          For all of the reasons expressed above, the Court determines that the Government's

4    forfeiture complaint was timely, assuming the propriety of the DEA's determination that Mr.

5    Lopez's original claim was invalid under the governing statute at that time.  The Court turns

6    now to an analysis of that issue.

7          2.    Sufficiency of the Original Claim Under the Original CAFRA Statute

8          The Government argues that, until Mr. Lopez's attorney sent his December 6, 2000

9    follow-up letter which clarified the nature of Mr. Lopez's interest in the seized currency and

10   the relationship of the funds to the grant deed provided with the claim, the claim was not

11   "filed" and the 90-day period did not begin to run.  The Court finds that the Government's

12   determination of the sufficiency of the original claim was a correct application of the

13   governing law at that time.

14         CAFRA, as originally enacted, required that a claim for seized property "state the

15   claimant's interest in such property (and provide customary documentary evidence of such

16   interest if available)."  The requirement to provide customary documentary evidence of such

17   interest requires some degree of evaluation by the seizing agency.  Unlike enforcement of

18   the requirement that a claim be made under penalty of perjury, which merely requires a

19   cursory review of the claim to ensure that it includes this language, determining if a claim

20   includes customary documentary evidence of the claimant's interest and, if not, whether such

21   evidence is available, requires thoughtful consideration by the agency receiving a claim.  The

22   discretion that was inherent in the agency's determination regarding customary documentary

23   evidence is reflected in the statements of Senator Leahy in support of the amendment to

24   CAFRA: "[T]he inserted language gives seizing agencies too much discretion to reject claims

25   because the documentary evidence is incomplete or otherwise unsatisfactory, and prior

26   experience tells us that agencies may exercise their discretion to deny claims arbitrarily."

27   146 Cong Rec. S11184, S11185 (daily ed. Oct. 26, 2000), available at 2000 WL 1608207.

28   Thus, the decision of the DEA to reject Mr. Lopez's original claim for failure to produce

customary documentary evidence was one committed to the discretion of the DEA and, thus, is afforded due deference under the Administrative Procedures Act.  See 5 U.S.C. § 706 (agency action set aside when found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

The DEA, which denied Mr. Lopez's original claim, is guided in its duties regarding seizures, forfeitures and disposition of property by regulations which were issued under the pre-CAFRA forfeiture scheme.  See 21 CFR § 1316.71, et seq.  Many of these regulations, including those pertaining to the provision of a cost bond by claimants, no longer appear to be relevant in large part because of the overhaul to the forfeiture process accomplished by CAFRA.  However, the DEA's conception of its duties in evaluating claim documentation was still relevant prior to the enactment of the December 2000 amendment of CAFRA, which eliminated the need for providing any documentary evidence whatsoever.  This conception is laid out in the regulation pertaining to "requirements as to claim and bond," which provides:

> When the claim and bond are received by the custodian or DEA Asset Forfeiture Section, he shall, *after finding the documents in proper form* and the sureties satisfactory, transmit the documents, together with a description of the property and a complete statement of the facts and circumstances surrounding the seizure, to the United States Attorney for the judicial district in which the proceeding for forfeiture is brought.

21 CFR § 1316.76 (emphasis added).  While the DEA no longer needed to review the surety to find it satisfactory at the time Mr. Lopez's original claim was received, because none was required, the requirement to provide customary documentary evidence meant that it still needed to "find[] the documents in proper form" before forwarding the materials on for filing of a forfeiture complaint.  The DEA's determination of whether such documentary evidence was provided is, accordingly, entitled to deference.

Claimants argue that the claim as filed was proper even under the previous statute because, as the seized property was cash, no documentary evidence of Claimant's interest in the property would normally be available.  This understanding is supported by reference to the legislative history of the enactment of CAFRA.  See 146 Cong. Rec. H2040-01, H2052 (daily ed. Apr. 11, 2000), available at 2000 WL 368969 (Rep. Barr  stated, and Rep. Hyde agreed, that the customary documentary evidence language "require[s] only prima facie

01cv414

1    evidence to establish such an interest" and "[f]or property such as cash in which no

2    documentary evidence is normally available, this provision would be loosely applied and

3    there would be an assumption of the claimant's interest in such property by simply making

4    a claim and asserting its nonfrivolous nature.").  However, Claimant Lopez did not simply

5    state that he was the owner of the seized currency and leave it at that.  Rather, he stated his

6    interest in the property "as an individual with an ownership interest in, and/or as an agent of

7    persons or entities with an ownership interest in, and/or as a bailor/bailee of [Enedina Peraza

8    Soto] individuals or entities with an ownership interest in said U.S. currency."  In addition,

9    without any explanation, he attached to the claim a grant deed for a transfer of real property

10   from Ms. Soto,[1] which reflected a transaction occurring after the seizure.  Moreover, while

11   claiming to be an agent or bailor of individuals or entities with an ownership interest in the

12   currency, Mr. Lopez did not include any agreement or documentation reflecting this agency

13   and/or bailment arrangement.

14          The Court finds that it was reasonable for the DEA, confronted with this seemingly

15   incongruous filing, to find the claim invalid as filed and, pursuant to its regulations, request

16   a clarification from the claimant.  <u>See</u> 21 CFR § 1316.76 ("If the documents are not in

17   satisfactory condition when first received, a reasonable time for correction may be allowed.").

18   The DEA specifically explained the basis for its determination in its November 27, 2000 letter

19   to Mr. Lopez's counsel:

20

21           The Grant Deed you submitted, presumably as customary
             documentary evidence of your client's interest in the property, reflects
22           a transaction occurring <u>after</u> the seizure between parties <u>other than
             the claimant</u>.  Please identify your client's particular interest in the
23           property and explain the relationship between the submitted
             documentary evidence and that interest, submit additional customary
             documentary evidence of such interest, or explain why such evidence
24           is unavailable.

25   The claim was not valid until this clarifying information was received and, thus, the 90-day

26   period for filing of the forfeiture complaint did not begin to run until that time.  Accordingly,

27   _____

28          [1] Ms. Peraza Soto's name appears as "Alicia Enedina Perasa Soto" on the August
     14, 2000 grant deed conveying the home to Mrs. Pimentel and Mr. Lopez's counsel referred
     to her by this name in his December 6, 2000 follow-up letter to the DEA.

1    the Government's forfeiture complaint was timely filed and Claimants' motion for summary

2    judgment upon this procedural ground is **DENIED**.

3

4    **B.    Cross Motions for Summary Judgment Upon Substantive Grounds**

5    Having determined that the Government's complaint was timely filed, the Court turns

6    to consideration of the parties' cross motions for summary judgment upon the substantive

7    grounds.  As is more fully expressed below, because material issues of fact remain in

8    dispute, both parties' motions for summary judgment are **DENIED**.

9    The Government has moved for summary judgment arguing that, as a matter of law,

10   it is more likely true than not that the seized currency was connected to illegal drug activity

11   and, therefore, is subject to forfeiture.

12   As a preliminary matter, the Court must determine the evidence upon which the

13   Government's summary judgment motion will be decided.  Both Mr. and Mrs. Pimentel claim,

14   in declarations submitted in support of the Government's motion, that they never paid

15   $58,000 in cash to either Mr. Lopez or his wife.  (12/13/01 Declarations of Martha Madrigal

16   Pimentel and Eliseo Pimentel; Doc. #92-3.)  Mr. Pimentel admits purchasing the Claimants'

17   home, but claims he paid by giving Mr. Lopez a car, a junkyard, $4000 cash and by

18   assuming the mortgage on the property.  (Id.)  However, the Pimentels' declarations were

19   not considered in deciding this motion because they both refused to answer Claimants'

20   questions at their December 10, 2001 deposition.  (Tr. 12/10/01 Deposition of Eliseo

21   Pimentel & Martha Pimentel.)  Three days after the deposition, the Government had the

22   Pimentels sign ex parte declarations.  These declarations were not disclosed to Claimants

23   until the Rule 16.1(f) conference in July 2002, two months after the close of discovery.  The

24   Government argues that the Pimentels' declarations should be considered because: (1) the

25   Pimentels did not invoke their Fifth Amendment privilege at the deposition, rather, they did

26   not want to be deposed separately and the Government, who had noticed the deposition,

27   obliged by terminating the deposition; and (2) Claimants chose not to move to compel the

28   Pimentels' deposition.  While there is merit to both of these arguments, the Pimentels' refusal

14

01cv414

1   to answer questions at the deposition was complete and, as Claimants had no reason to

2   expect that there would be any testimony from the Pimentels until their declarations were

3   disclosed after the close of discovery, fairness requires that this Court not consider the

4   declarations in deciding the present motions.  C.f. United States v. Parcels of Land, 903 F.2d

5   36, 43-46 (1st Cir. 1990) (affirming district court's striking of witness's ex parte affidavit when

6   witness refused to submit to deposition questioning).  Accordingly, the Court accords the

7   declarations no weight.  At any rate, even if the declarations were considered, they would not

8   support a grant of summary judgment for the Government because the facts presented in

9   them are flatly contradicted by the Claimants and, thus, a dispute remains as to the very

10   material facts regarding the Pimentels' purchase of the house.  (See, e.g., Tr. 5/16/02

11   Deposition of Alicia Soto at 14-15; Claimant Lopez's 2/22/02 Responses to Government's

12   First Set of Written Interrogatories at 6-7.)

13       In its motion, the Government argues, repeatedly, that it merely needs to prove that

14   "it is more likely true than not" that the seized currency was connected to one or more illegal

15   drug transactions, because the standard for forfeiture is a preponderance of the evidence.

16   However, its argument attempts to gloss over the fact that this is a motion for summary

17   judgment.  That is, while the evidence at trial must satisfy that burden of proof, at this stage,

18   there must be no genuinely disputed issues of material fact.  Having carefully examined the

19   record, the Court finds that disputes of material fact preclude granting either party's motion.

20       In response to interrogatories and document requests submitted by the Government,

21   including questions regarding the circumstances under which Mr. Lopez obtained the

22   currency in question, Claimant Lopez asserted his Fifth Amendment right against self-

23   incrimination.  The Government urges this assertion of the Fifth Amendment privilege as a

24   basis for granting its motion.  While an adverse inference could normally be taken from

25   Claimant's invocation, as this is a civil matter, there is persuasive caselaw suggesting that

26   a forfeiture action should not be considered a normal civil action because of the inherent

27   punitive nature of the proceeding and its close ties to criminal proceedings.  See, e.g., United

28   States v. Real Property Known as RR1, Box 137-B, Cutler, Ohio, 24 F.3d 845, 851 (6th Cir.

1994) ("The government's attempt to equate forfeiture proceedings with ordinary civil proceedings is misguided. The Supreme Court recently reviewed the history of civil forfeiture actions and found them to be a form of punishment subject to the limitations of the Eighth Amendment's Excessive Fines Clause. *Austin v. United States*, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993)."). The Government points out that no criminal charges were ever filed against Claimant, but there never was any offer of immunity made to Claimant in order to allay any fears of prosecution that he could have rightfully held. The concern over the quasi-criminal nature of forfeiture proceedings is enough to give this Court pause in deciding a motion for summary judgment based on an inference drawn from an invocation of Fifth Amendment rights. In addition, while there is some evidence connecting Mr. Lopez to drug trafficking activity, it is quite possible that the proper inference to be drawn from his Fifth Amendment invocation, if any, is merely that the money was connected, in some way, to some unspecified illegal activity that he does not wish to divulge for fear of prosecution. This would not be enough to warrant summary judgment on the Government's claim, which requires proof that the funds were related to *drug* activity.

Accordingly, the Court finds that material issues of fact remain in dispute and, thus, the Government's and the Claimants' motions for summary judgment are **DENIED**. It is properly left for the fact-finder, with the aid of a full trial, to decide the credibility of the relevant testimony and determine the weight to assign to any piece of relevant evidence.

//
//
//
//
//
//
//
//

### III.     <u>CONCLUSION</u>

1    Both Plaintiff's and Claimants' motions for summary judgment [Docs. #92 and 93] are

2  **DENIED** in their entirety.  All parties are directed to appear before this Court for a status

3  conference on Tuesday, February 6, 2007 at 4:30pm.

4

5  **IT IS SO ORDERED.**

6

7  DATED:  January 26, 2007

8

9                                    Hon. Barry Ted Moskowitz
                                     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

01cv414